CLARA JOSEPHINE MYERS, APPELLEE, V. LEVI MYERS ET AL., APPELLANTS.

FILED NOVEMBER 13, 1922. No. 22546.

1. **Wills: CONSTRUCTION: "LAWFUL HEIRS."** Where a testator by his will devised a life estate in real property to a person, and at her death to her "lawful heirs," *held*, that by the rule in Shelley's case the word "heirs" is to be taken as a word of limitation, and that such person becomes vested with a fee.

2. ——: **RULE IN SHELLEY'S CASE.** The operation of the rule in Shelley's case does not conflict with any Nebraska statute and is in strict accord with the public policy of this state.

APPEAL from the district court for Fillmore county: RALPH D. BROWN, JUDGE. *Affirmed.*

*Sloan, Sloan & Keenan* and *F. B. Donisthorpe,* for appellants.

*Waring & Waring* and *William R. Fulton,* contra.

Heard before MORRISSEY, C. J., ROSE, ALDRICH and FLANSBURG, JJ., REDICK and SHEPHERD, District Judges.

FLANSBURG, J.

This was an action by plaintiff, Clara Josephine Myers, to quiet title to certain real estate which she claimed under the will of Miller Valentine. The will, by its terms, gave her a life estate, and after her death directed that the property go to her "lawful heirs." The trial court found that the plaintiff was vested with a fee title and granted the prayer of her petition. Appellants, the children of the plaintiff, appeal.

It is admitted by the appellants that nothing in the will in any way restricts or qualifies the meaning of the term "lawful heirs," and, if the rule in Shelley's case is to operate in this state, that the plaintiff's life estate and the remainder in her heirs would merge and the plaintiff be vested with a fee.

It is contended, however, that the rule in Shelley's

case is not and should not be a part of the law of Nebraska. No objections have been urged against the rule, which was not passed upon in the case of *Yates v. Yates*, 104 Neb. 678. The decision in that case hinged entirely upon the question of whether the rule existed here, and, if so, to what extent it could operate. The limitation there was to Almeda Yates for life and then in *"fee simple"* to the "heirs begotten of her body." At common law a grant to Almeda Yates and to the heirs of her body would have created an estate tail, in this state a fee simple conditional. But the grant in the *Yates* case was of an estate in *"fee simple"* to the heirs of the body of Almeda Yates. The term could not, therefore, be allowed to be given its technical effect without violating the express intention of the testator, which was that the heirs should take in *fee simple* and *not a conditional fee*. The terms "heirs begotten of the body" could not, by reason of the context in which they were used, be given effect as words of limitation. They were therefore construed as words of purchase, describing only those heirs which should be begotten of the body of Almeda Yates— in other words, her children. In the *Yates* case the rule in Shelley's case was invoked, and, without an understanding of the rule and a decision as to its principle and the extent of its operation in Nebraska, the issues raised in that case could not have been fairly decided. We do not consider that part of the opinion dealing with the rule in Shelley's case to be dictum.

The testator in the instrument now under consideration used the term "heirs" without restriction. We have no reason to believe he did not mean just what he said, that after the death of Clara Josephine Myers he wanted the property to go to her "lawful heirs," whoever they might happen to be at the time of her death. He did not specify in what manner he wanted the estate to be distributed among them, nor what the shares should be, nor whether the property should descend *per stirpes* or

*per capita.* He was satisfied, no doubt, that the law of
descent and distribution would, when the time came,
fully and in a fair manner control the disposition of
the property. When he drew his will, he did not know
whom Mrs. Myers would have as her heirs. He did not
know whether she would leave a living spouse, children
or only grandchildren; or whether there would be none
but collateral heirs. Had he been concerned as to who
among them should take, he would have indicated his
desire. He certainly did not intend to refer only to her
children as particular individuals who should take by
purchase, and, should she leave no living children, that
her grandchildren should not take; nor did he intend,
should she leave no direct heirs, that her collateral heirs
should go unprovided for under the will.

Under the rule in Shelley's case, the term "heirs," ex-
cept where the testator, by expressions in his will, is
shown to have used the term in another sense, is held to
have had reference to all legal heirs left by the life tenant
at her death, and not to some restricted class among
them, and, furthermore, the testator is held to have in-
tended that the property devised should, at the termina-
tion of the life tenancy, go to the lawful heirs, then de-
termined, in the manner as provided by law. Manifestly,
the rule does not in such interpretation violate the ex-
pressed intention of the testator; on the other hand, it
establishes and makes stable the meaning of terms, and
gives to the instrument the only interpretation of which
it is reasonably capable.

Counsel for appellants, in the same breath with their
argument that such an interpretation violates the inten-
tion of the testator, seek to construe the term "heirs" as
being limited in this case to immediate children only.
The rule they seek to establish is that the term "heirs"
is to be interpreted, not in the light of what the testator
may have had in mind at the time of the execution of the
will, but, rather, in such a way in any particular case as

to meet peculiar exigencies after they may have arisen; that we should embark upon the field of speculation; in one case, the term "heirs" would be given one meaning, in another case, quite a different one. Such a rule would inject into the law uncertainty and confusion in the construction of instruments using terms which now have a settled meaning not only among lawyers but with the layman as well.

Appellants admit that there is nothing in the will to indicate that the testator intended to restrict the term "heirs" to refer to children only. The term "heirs," even in its ordinary use, is not so restricted in its meaning. Had these appellants been the grandchildren of Mrs. Myers, their parents being dead, would they now be willing to abide by the same interpretation which they are now contendng for, or would they then wish to extend the meaning of the term "heirs" to include grandchildren as well as children? And, had these appellants been collateral heirs of Mrs. Myers, there being no children or grandchildren, would their counsel not contend that the testator had intended to include them within the term "heirs," or would they concede that, as to the remainder in the property, the testator had died intestate, and that the property should descend to his heirs, rather than to the heirs of the life tenant? These are some of the difficulties to be met in the interpretation of the term "heirs," once the court departs from the real meaning of that term.

Having interpreted the will, in accordance with the expressed intent of the testator, to be a direction that the estate to go to Mrs. Myers for life and then, at her death, to descend to her heirs, the rule in Shelley's case goes one step further. It establishes the principle that such a disposition is contrary to public policy, and the two interests, the life estate and the remainder to the general heirs, are caused to merge. The life tenant then takes the entire title.

When a testator gives a property to one for life and then to his heirs, it appears that he intends to convey to the life tenant an interest in the property, which has, in practical effect, all the attributes of a fee-simple title, except as to the right of alienation. The life tenant is by terms given the full use and control of property which must, at his death, descend to such persons as shall then be determined to be his heirs, and he cannot, by his act, cut off the inheritance. The testator's intention is to tie up the disposition of the estate during the life of his devisee and then to require the property to descend according to law, the same as if the devisee had, in fact, had a fee title.

Where the testator has particular beneficiaries or a class of beneficiaries in mind, he is justified in preserving the property for them until the time when they shall take. But, where he thinks of no such devisees, as particular persons who shall take, and only attempts to direct the course of the descent of the property from his named devisee, should he be allowed, by a dead arm stretching from the grave, to withhold from that devisee the right of alienation, the only attribute of a fee simple title which is lacking, and which right should be included within that full enjoyment and complete control of property which is the right of the living? It is of course the province of a testator to tie up property for a period after his death for a justifiable end, but is the mere object, that that property shall descend by operation of law from the first taker to his heirs, a good reason for his exercising such restraint?

Let us stop here to mention a rule quite universal, one which exists in this state, and one with which the appellants have no quarrel. Where a testator devises property to a person and to his heirs, the conveyance of a fee, he cannot, by his will, make a valid restriction to the effect that such person shall not alienate the property during his lifetime; and yet, is not the rule based upon the same principle of public policy as is the rule in Shel-

ley's case? In either event, the extent and nature of the estates attempted to be created are, in practical effect, the same. In the one case, the devisee is given the title which must descend to his heirs, for he is prohibited from disposing of it during his lifetime; in the other, he is given the property to use during his life, which prevents him from conveying a fee, and then it is provided that at his death the property shall descend to his heirs.

The law looks to the substance and not to the letter. If the attempt to tie up property, in the one case, by a prohibition against alienation is considered against public policy, then surely an attempt to do the same thing by a different phraseology is also to be condemned.

The history and a discussion of authorities involving this rule are found in the *Yates* case.

We are of opinion that the rule was properly applied by the trial court, and the judgment is

AFFIRMED.

Rose, J., dissents.